```
                                                                    1
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
 2                        EASTERN DIVISION

 3

 4   UNITED STATES OF AMERICA,    )
                                  )
 5        Plaintiff,              )
                                  )
 6        v.                      )No. 4:14-CR-00178 HEA
                                  )
 7   MELVIN L. WILSON,            )
                                  )
 8        Defendant.              )

 9

10                      SENTENCING HEARING

11           BEFORE THE HONORABLE HENRY E. AUTREY
                 UNITED STATES DISTRICT JUDGE

12

13                       JUNE 8, 2015

14

15   APPEARANCES:

16   For Plaintiff:        Jennifer A. Winfield, Esq.
                           OFFICE OF U.S. ATTORNEY
17                         111 South Tenth Street, 20th Floor
                           St. Louis, MO  63102
18
     For Defendant:        William S. Margulis, Esq.
19                         CAPES AND SOKOL
                           7701 Forsyth Blvd., 12th Floor
20                         St. Louis, MO  63105

21   REPORTED BY:          ANGELA K. DALEY, CSR, RMR, FCRR, CRR
                           Official Court Reporter
22                         United States District Court
                           111 South Tenth Street, Third Floor
23                         St. Louis, MO  63102
                           (314) 244-7978
24

25       PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION
```

2

1      **(PROCEEDINGS STARTED AT 10:35 A.M.)**

2      **(THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT AND WITH**

3                **THE DEFENDANT PRESENT.)**

4              THE COURT:  This is the matter of United States of

5      America versus Melvin L. Wilson, also known as Melvin Lonnell

6      Wilson, also known as Mike, also known as Polo, case number

7      4:14-CR-00178 HEA.  This matter is before the Court for

8      purposes of sentencing; the defendant having pleaded guilty on

9      March 9th of this year to one count of transportation with

10     intent to engage in prostitution.  Sentencing was deferred

11     pending receipt of a presentence investigation report which

12     the Court has now received and reviewed in its entirety.  Let

13     the record now reflect defendant is present in open court with

14     counsel, Mr. William Margulis; the Government is present

15     through Ms. Jennifer Winfield.  Mr. Margulis, on behalf of the

16     defendant, are you ready to proceed?

17             MR. MARGULIS:  Yes, we are, Your Honor.

18             THE COURT:  Ms. Winfield?

19             MS. WINFIELD:  Yes, Your Honor.

20             THE COURT:  Have you had the opportunity to review

21     the presentence investigation report in this matter with your

22     client, Mr. Margulis?

23             MR. MARGULIS:  I have, yes, sir.

24             THE COURT:  And as a result of that review, do you

25     have any objections to the factual statements set out in the

3

1   report or to the way in which the drafter has applied the

2   guidelines in their advisory capacity?

3           MR. MARGULIS:  No, Your Honor.

4           THE COURT:  Any objections on behalf of the United

5   States?

6           MS. WINFIELD:  No, Your Honor.

7           THE COURT:  Very well.  There being no objections to

8   the factual statements set out in the report or to the way in

9   which the drafter has applied the guidelines, the Court

10  accepts those facts and concludes therefrom that the total

11  offense level now applicable to the defendant is 29, the

12  appropriate criminal history category is six, which

13  establishes a guideline provision range of 120 months, a

14  period of supervised release of five years to life, and a

15  special assessment of $100.  Having so concluded, are we now

16  ready to proceed with sentencing?

17          MR. MARGULIS:  Yes, Your Honor.

18          THE COURT:  Anything you want to say on behalf of

19  your client before the Court imposes sentence in this matter,

20  Mr. Margulis?

21          MR. MARGULIS:  Yes, Your Honor.  I did file a

22  sentencing memorandum.  The Court just indicated the guideline

23  range.  The count that Mr. Wilson pled guilty to actually has

24  a ten-year statutory maximum, which I think comes out a little

25  bit lower than what the calculated guideline range is.  As I

4

1    discussed in my sentencing memorandum and I know it's noted in

2    the presentence investigation report as well, we are asking

3    the Court to sentence Mr. Wilson to 84 months, and we are also

4    asking that the Court run the time concurrent to any time that

5    he has to do on his state probation revocation in the city,

6    the circuit court of the City of St. Louis, which is still

7    pending.  I did note Mr. Wilson's rather difficult childhood

8    and upbringing, not that that is any excuse for his conduct in

9    the instant case, but I think it does shed light on how at

10   least it has affected his adulthood and the choices that he

11   has made, and I think he has recognized that as well based on

12   some of our conversations.  So I would ask the Court to take

13   all that into consideration and sentence Mr. Wilson to 84

14   months concurrent to any time on his state probation case.

15          THE COURT:  All right.  Ms. Winfield, anything on

16   behalf of the United States?

17          MS. WINFIELD:  Yes, Your Honor.  At this time, the

18   Government is requesting a 120-month sentence in this case,

19   which technically although the maximum is 120 months, his

20   guideline range would have actually been 140 to 175, so

21   technically the 120 is below the guideline range in our

22   opinion.  Your Honor, and that is based on Mr. Wilson's

23   extensive criminal history and just the facts surrounding this

24   case.  The victim in this case was a young girl who was

25   manipulated, physically abused, sexually abused by Mr. Wilson,

5

1   and all of that, of course, is outlined in the PSR.  I just

2   ask that the Court take into consideration the treatment and

3   the victim in this case most importantly.  She dealt with a

4   lot.  Not only that, the Government, of course, is aware of

5   Mr. Wilson's background as Mr. Margulis pointed out, but his

6   upbringing is no excuse for his continued criminal activity in

7   our community.  Mr. Wilson is on probation right now with a

8   ten-year backup, and the Government will remain silent as it

9   did in the plea agreement regarding a concurrent or

10  consecutive sentence in this matter; however, we believe

11  anything below a 120-month sentence in this case would not

12  deter Mr. Wilson, nor would it deter anybody else in the

13  community.  In addition to that, it would not be appropriate

14  in this particular case.

15          THE COURT:  Mr. Wilson, is there anything you want to

16  say in your own behalf?

17          THE DEFENDANT:  Yes, sir, Your Honor.  Your Honor, I

18  agree with Ms. Winfield when she say my background is not an

19  excuse for everything that went on or any decision that I

20  made.  I'm a little nervous.  You know, I'm going to get

21  sentenced.  Yeah, I made the decisions that I made, Your

22  Honor.  Whatever happened, you know what I'm saying, whatever

23  circumstances that came up, I made the decision, and I did

24  what I did, Your Honor.  But just letting you know about me,

25  Your Honor, I think my childhood and everything, you know, was

6

1    pretty normal growing up, at least that's how I looked at it.

2    You know, I looked at it as being normal.  Like my friends and

3    my peers and everybody I was around, when you grow up in a

4    neighborhood, they pretty much the same.  You know what I'm

5    saying.  Some people rise above and some people don't.  It's

6    the choice that you make in life that get you where you at.

7    You know what I'm saying.  And I think as far as I can

8    remember, I think I had it pretty okay.

9           My father, he was abusive.  He beat on my mother.  I

10   can remember times where, you know, even as a child, as a

11   little child, 6, 7 years old, I still have memories of

12   watching my father chase my mother with belts and stuff.  I

13   love my father, and I love my mother.  I think my

14   relationship -- just giving you insight on me, you know what

15   I'm saying, because I'm just right here on paper, you know

16   what I'm saying.  As much as you know about me is what you

17   have in front of you.  The man was abusive.  My father beat my

18   mother, and I think my father showed favoritism towards me.  I

19   was named after him.  I was his first son, so I think that had

20   an effect on my family.  I think I was probably looked at or I

21   was ostracized you could say with my siblings and my mother's

22   mother and her brothers.  I think everybody looked at me

23   different because I was my father's son.  I didn't see it

24   then, but that's just how I was raised.  In my family, it was

25   pretty normal.

7

```
1          I remember watching my father try to kill my mother
2     one time.  I think that's when everybody hated my father, but
3     I think that's the time where I think I started hating my
4     father, too.  You know what I'm saying.  I was like 12 years
5     old.  I remember just coming into the room -- my father would
6     come and visit us after they got separated.  I was about 12 or
7     13 when they separated.  I remember coming in the room and
8     watching my father on top of my mother and stabbing her and
9     blood.  You know, I felt helpless.  I couldn't do nothing.  I
10    think that's when I started hating my father, and I think
11    that's when things went bad for me, you know, because I didn't
12    have a father in the house.  At the time they were married, I
13    was lucky to have two parents in the house.  A lot of people
14    don't have that, a lot of my friends.  You know what I'm
15    saying.  So when I look at my situation, just thinking, I'm
16    like, man, I'm way lucky than them, I had a mother and a
17    father, but I think that I probably would have sacrificed that
18    early on having a father if I could have had something more
19    stable.  You know what I'm saying.
20         I think when I seen my father try to kill my mother,
21    I think that did something to me, made me hate my father.  And
22    my father was a crackhead.  That's what made me not want to be
23    like my father, so I had this desire inside of me at that age
24    just to do different, but I just didn't have -- I guess I was
25    faced with choices.  I was young, and I made those choices,
```

8

1  and I turned to the streets.  You know, 13, 14, I think I was

2  stealing cars and selling drugs and, you know, stuff like

3  that.  You would think it's rebellious, but I think when you

4  in a neighborhood, you know, you're like that age, it's no

5  excuse, but I think you just -- it's like a rite of passage

6  for us, you know what I'm saying, being a drug dealer or being

7  known that you're violative, stuff like that, so I think

8  that's what I turned to, Your Honor.  And I think by the age

9  of 15, I was on heroin and I was selling crack.  You know, and

10  I was trying.  I thought I wanted to be everything but my

11  father, but I think I was turning into him early.

12          I think when I went to jail, Your Honor, I was 20

13  years old.  You know, that's my first offense when I went for

14  a ten-year sentence, and I think, Your Honor, I think it was

15  for the best.  You know what I'm saying.  I think it did

16  some -- it kind of helped me.  You don't want to be locked up,

17  but I think I probably would have been dead.  You know what

18  I'm saying.  The road I was on at the time, and I was using

19  heroin and I was just out there real bad at 20 years old, so I

20  think -- I had a son.  I just had a son when I got locked up,

21  so I think while I was in there, I was just motivated.  It

22  just it did something.  Like my son just motivated me I think

23  to new heights.  I just wanted to do so much and be so much

24  for him that when I was in there, I totally changed my life.

25  I became -- you know, I felt like I became a man, and I

9

1    started -- I thought I started making better decisions towards

2    my end, because when I was in there, I was kind of wild, but

3    towards the end I was coming home, I was like, you know what,

4    I want to do something different.  I want to be somebody for

5    my son.  I don't want to use drugs.  I don't want to do that.

6         You know, when I came home -- I did eight and a half

7    years in there, and when I came home, I was 29, just turned 29

8    years old, and I felt I was a better man, and I took off

9    running, Your Honor.  I took off running.  I got a job like

10   the first two weeks I was home.  I got a job.  Within the

11   first six months, I had my own apartment, Your Honor, my own

12   vehicle.  Six months later, I made field supervisor at my

13   heating and cooling company.  I made field supervisor.  I was

14   just motivated and I was working hard, Your Honor.

15        But, you know, life takes turns I think.  You get

16   tested all the time.  You know what I'm saying.  Since I have

17   been locked up, people get religious.  I have been reading the

18   Bible more.  You know what I'm saying.  I have been thinking

19   like it's those times when you are tested the most and when

20   you are right at your breaking point, that's when you're

21   there.  You know what I'm saying.  You either going to hold or

22   you're going to fold.  You know what I'm saying.  You get to

23   those breaking points, you hold or you fold, and it's just

24   that time where you make a decision that's going to impact

25   your life.  You know what I'm saying.  I think when I got to

1    that point in my life, Your Honor, I folded.

2              I remember when I had my apartment and I was working

3    at the heating and cooling company and I was making a nice

4    amount of money, it was an air duct cleaning company, so we

5    was going around and cleaning air ducts.  I don't know if you

6    remember on the news, they started talking about the air

7    ducts, and they was saying it was a big scam, so we started

8    losing a lot of business, but I was a good salesman.  You know

9    what I'm saying.  So my days started getting shorter.  I was

10   making a nice little amount of money, so I was able to keep up

11   my life.  I was able to pay all my bills and pay my car note

12   and, you know, all that.  I started losing days, and I started

13   working like two days a week, and money just got funny, and it

14   was just like, dang, so I will go get a second job.  I started

15   working at another company out in St. Charles, and I got two

16   jobs, and it was a lot of stress, it was a lot of pressure,

17   but I was maintaining it.  I was doing what I was supposed to

18   do.

19             I got laid off from my one job, and the job I was at

20   in St. Charles, I wasn't making enough money.  So now I make

21   the decision, I said, you know what, I am going to get me some

22   weed.  You know what I'm saying.  I was scared, Your Honor.  I

23   didn't want to sell drugs.  That wasn't my lifestyle no more.

24   You know what I'm saying.  I went to jail for selling drugs.

25   And I got this weed, Your Honor.  I got a half pound.  I got a

11

1   half pound of weed and a little money. I said I'm going to

2   flip this, I'm going to try to make some money. I didn't get

3   through the first ounce when I caught that case in the city

4   that I got on probation for. You know, it was like a wake-up

5   call. It was like shit -- excuse my french, like dang, you

6   know, I got to do something different. I have got to do

7   something differently.

8        But, Your Honor, I think, Your Honor, I just started

9   to spiral. I end up getting put out of my apartment, and

10  that's when everything just went. It was like, man, I started

11  hanging out at the Peabody projects, and the people I was

12  hanging with, they were sippin that Lean, they call it Lean,

13  that syrup. I got into that, Your Honor. I started back

14  using heroin. You know what I'm saying. I got back to using

15  drugs, and it was like a down spiral. And, Your Honor, I got

16  into this stuff, Your Honor. You know, first it was, you

17  know, I can do this or we can do this and we can get high and

18  that will be okay. You know what I'm saying. It just

19  spiraled out of control. It went to something that I didn't

20  want it to be. You know what I'm saying. But I didn't make

21  the right decisions, Your Honor. I made the wrong decisions,

22  Your Honor.

23       And then I met the young lady, Your Honor, you know.

24  And I want it to be known, when I met her, I didn't meet her

25  under the pretense that she was a juvenile. You know what I

12

1   am saying.  I met her under the pretense that she was an

2   adult.  That's what I thought.  But then, Your Honor, I found

3   out she was a juvenile.  And after we got arrested and I found

4   out, you know what I'm saying, Your Honor, I could have

5   stopped right there, Your Honor.  I could have stopped right

6   there, Your Honor.  You know what I'm saying.  I could have

7   just left it alone.  I could have did a lot of things

8   different.  You know what I'm saying.  I could have, but I

9   didn't, Your Honor.  It was my choices.  You know what I'm

10  saying.

11          And I was out there.  I was just out getting high,

12  and I was just making the wrong decisions in my life, you

13  know.  And I think that after that happened -- and, Your

14  Honor, I think the best thing that happened after that was I

15  was put on the six months GPS because my wife moved back up

16  here from Georgia, and we got a house out in Jennings, and

17  things just changed for me when she moved back to St. Louis

18  because then it was like she was here and she helped me get

19  back off drugs, and then I got a job, and I was on six months

20  GPS for my state probation, and I just left the lifestyle

21  alone.  And I was working, I was dealing with my family, but I

22  still have struggles.  You know what I'm saying.  But like I

23  say, Your Honor, it was my decisions, and I did what I did,

24  and I apologize.  This just didn't affect me or the people who

25  were involved; it affected all of our families.  You know what

13

1  I'm saying.  And I am, I'm sorry.  You know what I am saying.

2  I made the wrong decisions, and I am sorry, Your Honor.  I

3  have got to live with that.  That's all I can say, Your Honor.

4         THE COURT:  And that's a lot.  Any legal cause why

5  sentence should not now be imposed?

6         MR. MARGULIS:  No, Your Honor.

7         MS. WINFIELD:  No, Your Honor.

8         THE COURT:  You know, Mr. Wilson, before the marshals

9  brought you out, I had some students in here, and one of the

10  kids said, Do you have fun sentencing people, Judge, and my

11  answer -- I don't think you were here then, maybe you came out

12  right after that -- was no.  Sentencing somebody is not fun.

13  There is nothing fun about sentencing.  I can think of a

14  thousand things to say about sentencing, and none of those

15  things have to do with fun.  It's just not fun.  It's not fun

16  for you.  It's not fun for me.  It's not fun for your lawyer.

17  It's not fun for the prosecutor.  It's not fun for anybody.

18  It's a very serious and sad thing because it affects everybody

19  in such a negative way, Mr. Wilson.  It's particularly sad for

20  those individuals who have been directly affected by it; in

21  this instance, it would be you and the young lady that was put

22  through this, particularly sad.  It may even be more sad,

23  Mr. Wilson, because, you know what, she will never recover

24  from the experience, not fully.  She will never be the way she

25  was before it happened, and you will never be the way you were

14

1    before it happened.

2          You are an intelligent guy.  You are an articulate

3    guy.  You are an insightful guy, and I think from what you

4    said, Mr. Wilson, you have 100 percent, 100 percent,

5    appreciation and understanding for what you did and how it got

6    you here today.  Because you have that understanding, the hope

7    is that you can use that and maintain that looking down the

8    road to not be in the situation again because you have that

9    insight.

10          Like so many others that come out of the BOP or out

11   of a prison at some point and have a plan to walk a better

12   road, like you said, life gets funny, and when life gets

13   funny, people make wrong decisions sometimes because they act

14   out of desperation.  I think you get that now.  And the key

15   for people to succeed, no matter who they are, whether they

16   just got out of the BOP or whether they just got out of some

17   state prison or whether they have never been there, is to

18   appreciate that during times of desperation, you should never

19   make a decision.  You either stay where you are or go talk to

20   somebody to say this is the way you should go.  You should

21   never act out of desperation.  Desperation leads to this kind

22   of stuff or worse.  There are worse things that could happen

23   from desperate decisions like this, Mr. Wilson.  You know that

24   because you've got a good head on your shoulder.

25          The fact that you fully recognize how you got to

15

```
 1   where you are does not excuse what you did.  It doesn't even
 2   diminish the severity of it, but it does provide hope for you
 3   that the cycle has ended for you being in places like this
 4   when your sentence is complete.  The other aspect, too,
 5   Mr. Wilson, is this.  I think that maybe you can share those
 6   thoughts with people that you come in contact with to help
 7   them get some understanding so that they don't come back in
 8   here again.  You already know the circumstance of the prison
 9   population because you have been there.  You know who is
10   there.  You know why they are there.  And the issue for them
11   is to make decisions and to come to a realization of who they
12   are so that they don't go there again.  I think the words that
13   you shared with us today are words that you can share with
14   people that you come in contact with, Mr. Wilson, that can
15   help them make decisions to not be there again.  They have
16   families and wives, too, and children.  They want to be with
17   them.  Those families want to be with their husbands or their
18   wives because that's the way it is supposed to be.
19            This is a terrible crime.  This is the United States
20   of America, Mr. Wilson.  It is not some jacked-up Third World
21   nation.  It is not some nation that disrespects people but
22   more importantly that disrespects women.  It's a nation that
23   respects and cares for everybody regardless of their gender,
24   regardless of their religious belief, regardless of their
25   race, their pigment, their ethnicity.  It is a nation of
```

16

1  respect.  You cannot disrespect the rights of an individual

2  just because they are of a different gender, just because they

3  are a woman.  You cannot use them for your own benefit.  You

4  cannot use them to line your own pockets.  You can't sell and

5  barter a woman in the United States of America, Mr. Wilson.

6  It's not what we do.  Not only is it illegal, it's immoral.

7  It's unconscionable.  It's unthinkable.  It's unfathomable.

8  In a very simple way of saying it, Mr. Wilson, it ain't right.

9  Nobody has the right to do that.

10         You talked about your mother, and you talked about

11  the things that your father did to your mother, and I know

12  that that hurt you, it still does, but by the same token, you

13  did the same thing to this young girl.  You made her your

14  whipping post but in a different way.  It's not right.  It's

15  disrespectful.  It's even un-American.  It's not what we do.

16  You have no right to do that.  I am ashamed for you.  Do you

17  understand me, Mr. Wilson?

18         THE DEFENDANT:  Yes, sir.

19         THE COURT:  There now being no legal cause why

20  sentence should not now be imposed, it is the order and

21  judgment of the Court pursuant to the Sentencing Reform Act of

22  1984 and pursuant to the provisions of 18 USC Section 3553(a)

23  that the defendant be committed to the custody of the Bureau

24  of Prisons for a term of 120 months.  The sentence imposed

25  herein is to be served and run consecutively to the term of

17

1   imprisonment imposed in case number 1222-CR0577 in the Circuit

2   Court for the City of St. Louis.  While in the custody of the

3   Bureau of Prisons, it is recommended that the defendant be

4   evaluated for participation in the sex offender treatment and

5   counseling program, occupational educational program if that

6   is consistent with Bureau of Prisons' policies.  Upon release

7   from imprisonment, the defendant shall be placed on supervised

8   release for a term of life.  Within 72 hours of release from

9   the custody of the Bureau of Prisons, the defendant shall

10  report in person to the probation office in the district to

11  which the defendant is released.  While on supervision, the

12  defendant will comply with the standard conditions that have

13  been adopted by the Court and the following additional

14  conditions.  If it is determined that there are costs

15  associated with any services provided, defendant will pay

16  those costs based on a co-payment fee established by the

17  Probation Office.

18          Defendant will refrain from any unlawful use of

19  controlled substances and submit to a drug test within 15 days

20  of commencement of supervision and at least two periodic drug

21  tests thereafter for use of controlled substances.  Defendant

22  will participate in a substance abuse treatment program

23  approved by the Probation Office which may include substance

24  abuse testing, counseling, Residential Re-Entry Center

25  placement, residential or inpatient treatment.  Defendant will

18

1   participate in a sex offense specific treatment program, and

2   defendant will enter, cooperate, and complete the program

3   until released by the Probation Office.  During the course of

4   the treatment, defendant will be subject to periodic and

5   random physiological testing which may include but is not

6   limited to polygraph testing or other specialized assessment

7   instruments.  Defendant will comply with all federal, state,

8   and local sex offender registration laws and provide

9   verification of registration to the Probation Office.

10          Defendant will be prohibited from contact with

11  children under the age of 18 without the prior written

12  permission of the Probation Office and report to the Probation

13  Office immediately but in no event later than 24 hours any

14  unauthorized contact with children under the age of 18.

15  Defendant will be prohibited from engaging in any occupation,

16  business, profession, or volunteer work where he has access to

17  children under the age of 18 without prior written approval

18  from the Probation Office.  Defendant will not frequent,

19  loiter, or reside within 500 feet of schools, parks,

20  playgrounds, arcades, daycare facilities, or other places

21  frequented by children under the age of 18 without prior

22  written approval from the Probation Office.

23          Defendant will not enter the premises or loiter near

24  where the victims reside or are employed or frequent except

25  under circumstances approved in writing by the Probation

1  Office.  Defendant will pay the costs of any future counseling

2  for the victims of this offense should counseling be pursued.

3  The defendant will also submit his person, residence, office,

4  computer, or vehicle to a search conducted by the Probation

5  Office based upon reasonable suspicion of contraband or

6  evidence of a violation of a condition of release.  Defendant

7  will warn any other residents that the premises may be subject

8  to searches pursuant to this condition.

9          Defendant will not possess or use any audio or visual

10  recording or producing equipment, a computer, peripheral

11  equipment, gaming equipment, cellular devices, or any other

12  devices with access to any online computer services or

13  subscribe to or use any internet service in any location

14  without the written approval of the Probation Office.  If

15  approval is given, defendant will consent to the Probation

16  Office or probation service representative conducting

17  unannounced examinations including retrieval and copying of

18  all data of any computer or computer-related equipment to

19  which the defendant has access, including web-enabled cell

20  phones and gaming systems to ensure compliance with this

21  condition or removal of such equipment for the purpose of

22  conducting a more thorough inspection.  Defendant will advise

23  the Probation Office of all computers, electronic equipment,

24  and web-enabled equipment including cell phones to which he

25  possesses or has access within 24 hours of obtaining the same.

20

1    The Court finds that the defendant does not have the
2    ability to pay a fine, and lastly, it is further ordered that
3    the defendant pay to the United States a special assessment of
4    $100, which will be due immediately.  Anything else,
5    Mr. Margulis?
6        MR. MARGULIS:  Your Honor, just briefly.  I would ask
7    the Court if the Court would consider recommending to the
8    Bureau of Prisons that Mr. Wilson serve his time somewhere in
9    the southeast region, specifically the medium security
10   institution at either Talladega, Alabama or Jesup, Georgia if
11   he qualifies, and I would also ask if the Court would consider
12   recommending to the Bureau of Prisons that Mr. Wilson be able
13   to participate in the residential drug abuse program again if
14   he qualifies.
15       THE COURT:  All right.  It will be the further order
16   of Court that the defendant be considered and evaluated for
17   placement at a facility in the southeast region, preferably
18   Talladega or alternatively the facility at Jesup.  It will
19   also be the -- I think I -- no, maybe I didn't.  It will also
20   be the further order of Court that the defendant be evaluated
21   for participation in the RDAP program.  Anything else?
22       MR. MARGULIS:  No, Your Honor.
23       THE COURT:  Anything further on behalf of the United
24   States?
25       MS. WINFIELD:  Yes, Your Honor.  As the defendant

21

1  pled guilty to Count One of the superseding indictment, the

2  Government requests dismissal of the indictment.

3       THE COURT:  It will be the order of the Court that

4  the indictment will be dismissed on oral motion of the United

5  States.  Having sentenced you as noted Mr. Wilson, it is now

6  my obligation to inform you of your rights regarding appeal,

7  so listen carefully.  You may appeal the sentence and judgment

8  in this matter, but you have to do that within 14 days of

9  today's date.  If you don't file your notice of appeal before

10 the 14 days runs out, then you will have given up your right

11 to appeal the sentence and judgment.  If you cannot afford to

12 pay the costs of filing the notice of appeal, you can request

13 that the costs be waived, and if the costs are waived, then

14 the Clerk of the Court will file the notice of appeal free of

15 charge in your behalf.  You may appeal the sentence and

16 judgment where you feel or believe that it violates the law in

17 some fashion or is otherwise contrary to the law or if it is

18 void or voidable on its face.

19       In any event, I believe, Mr. Wilson, that you have

20 given up your right to appeal by virtue of your plea agreement

21 in this case and your plea on the record consistent with that

22 agreement.  If you preserved any aspects of appeal, they are

23 limited to those things that relate to ineffective assistance

24 of counsel or prosecutorial misconduct, okay?

25       THE DEFENDANT:  Yes, sir.

22

1          THE COURT:  Do you understand your rights of appeal

2   as I have described them to you?

3          THE DEFENDANT:  Yes, sir.

4          THE COURT:  Do you have any questions?

5          THE DEFENDANT:  No, sir.

6          THE COURT:  All right.  That will conclude this

7   proceeding.  The defendant is remanded to the custody of the

8   marshal to begin service of his sentence forthwith.  Good luck

9   to you, Mr. Wilson.

10          **(PROCEEDINGS CONCLUDED AT 11:08 A.M.)**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

23

CERTIFICATE

I, Angela K. Daley, Registered Merit Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 22 inclusive and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

Dated at St. Louis, Missouri, this 16th day of June, 2015.


_____
/S/Angela K. Daley
Angela K. Daley, CSR, RMR, FCRR, CRR
Official Court Reporter